UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| TAMEKA JOHNSON, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | CAUSE NO. 2:11-CV-260 JD |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |  |
| Defendant. | ) |  |

**OPINION AND ORDER**

Plaintiff Tameka Johnson ("claimant") filed applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) on January 23, 2006, alleging a disability onset date of January 1, 2002. [R 22]. She claimed disability due to symptoms of bipolar disorder and depression. [R 89]. Her applications were denied both initially and upon reconsideration. [R 31; R 32]. The claimant retained an attorney, and on June 2, 2008, she appeared and testified at a hearing before an administrative law judge ("ALJ") and a vocational expert ("VE"). [R 395-447]. On August 27, 2008, the ALJ issued a decision in which he found the claimant not disabled under the Social Security Act, both because she was able to perform past relevant work as a waitress and because she was able to perform other work that existed in significant numbers in the national economy. [R 22-30]. The claimant sought review, but on April 15, 2009, the appeals council denied the claimant's request [R 3-5], and the ALJ's decision became the final decision of the commissioner. The claimant appealed the commissioner's final decision to federal court, and on February 2, 2010, Magistrate Judge Paul R. Cherry granted an unopposed remand to the commissioner for further proceedings. [R 482-487]. The case made its way back down to the ALJ, and on April 22, 2011, a new hearing

1

was held. [R 1686-1746]. At the second hearing, the ALJ heard testimony from the claimant, a medical expert, and a new vocational expert. On May 19, 2011, the ALJ issued a new decision finding the claimant not disabled. [DE 1-1; R 451-465]. This time, the claimant did not file exceptions to the ALJ's decision with the appeals council, nor did the appeals council independently assume jurisdiction of the case. After sixty days, the claimant filed her complaint [DE 1] in this court. *See* 20 C.F.R. §§ 404.984(d), 416.1484(d).[1] The claimant raises four issues, challenging the ALJ's decision at various points in the deliberative process. The court finds that remand is required because the ALJ failed to confront significant contrary evidence during his listings analysis.

## BACKGROUND[2]

### A.     Claimant's Medical Condition

On the date of the second hearing, the claimant was 28 years old. [R 1691]. She has an eighth-grade education [R 93], and has previously worked as a waitress and as a child monitor for friends and family members who go to work. [R 90]. For years, the claimant has suffered from depression and bipolar disorder. The effect of these conditions on her well-being varies. At times, the claimant experiences mood swings; feels unaccountably angry, "down", frustrated, or irritable; and suffers from concentration and memory problems. [R 89, 95, 121, 149, 154, 175-81, 189, 352, 359, 906-07, 1589, 1596-1602, 1618]. According to the claimant, on her worst days – which she estimates occur about twice a month – her symptoms are debilitating to the extent that she struggles

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 et seq. For convenience, only the DIB regulations will be cited henceforth in this memorandum.

[2] This section is a simple summary of the facts of the case; it is not meant to be exhaustive, particularly where the record spans nearly 2,000 pages. Material facts are explored in more detail during the court's discussion of the issues.

to get out of bed at all. [R 417-18, 428, 886, 1643]. On one occasion several years ago, the claimant's depression worsened to the point that she was hospitalized as a suicide risk. [R 422, 1596-1602]. At the same time, there are days – many of them – where the claimant functions relatively well. For at least seven years, she has babysat the children of neighbors, friends, and relatives for six to eight hours a day. [R 1694-1700]. At times, she has been responsible for as many as seven children in addition to her own, and she typically monitors the children, prepares meals, and assists with homework, sometimes on her own and sometimes with assistance from her husband and the oldest of her children.

In addition to her psychological difficulties, the claimant suffers from some physical ailments. From 2005 on, she has intermittently complained to physicians of pain in her right knee. [R 146, 189, 191, 213, 1068, 1167, 1173-74]. She has also been seen for asthma, which she claims limits her respiratory function, causes shortness of breath, and is aggravated by various environmental conditions. [R 133, 153, 186, 1088, 1096, 1104, 1171, 1179, 1745]. For the past three or four years, she has suffered from multiple abscesses, occurring mostly in her armpits, on her thighs, and under her breasts. [R 1704-1710]. In the past they were a source of pain, but did not physically limit her range of motion. Recently, however, the claimant had the sweat glands under her arms removed in an attempt to curb the frequency with which abscesses grow in that area. [R 1705]. Since the surgery, she has been unable to lift her arms above her head. [R 1718]. Finally, the claimant is morbidly obese. It is difficult to precisely measure her BMI, because both her weight and height fluctuate constantly throughout the record. Her recorded weight ranges from 220 lbs. to 276 lbs. [R 88, 190, 213, 234, 404, 975, 1269-70, 1621], and physicians report her height as 5'3" [R 1105], 5'8" [R 1158], and almost everything in between. [*See, e.g.,* R 949, 1198, 1619]. Making

3

matters worse, the claimant has self-reported to the ALJ as both 5'2" [R 404] and 5'6" [R 1702]. Without much explanation, the ALJ settled on 5'6". [DE 1-1 at 9]. Using that figure, her weight range results in a BMI between 35.5 and 44.5[3], and the ALJ settled on a BMI of 40.7. [DE 1-1 at 13]. A BMI greater than 40 is considered "extreme obesity." SSR 02-1p.

At the April 2011 hearing, psychologist David Biscardi, Ph.D. [R 1668], testified as a medical expert. Dr. Biscardi testified that as a result of her psychological disorders the claimant suffers from "mild" limitations in activities of daily living and "moderate" limitations in social functioning. [R 1725]. Her difficulties with concentration, persistence, or pace are "moderate at worst," and she has experienced just one episode of decompensation. [R 1726]. In terms of the claimant's mental residual functional capacity ("RFC")[4], Dr. Biscardi testified that the claimant is moderately limited in the following areas of functioning: ability to understand, remember, and carry out complex instructions; ability to make complex work-related decisions; ability to interact appropriately with the public and supervisors; and ability to respond appropriately to usual work situations and changes in a routine work setting. [R 1727-28]. She is also mildly limited in her ability to interact with coworkers. [R 1728].[5]

In January of 2011, Kanayo K. Odeluga, M.D., board certified in internal medicine and occupational medicine, conducted an extensive consultative examination of the claimant. He submitted an examination report with accompanying forms indicating range of motion, pulmonary

---

[3] See Calculate Your BMI - Standard BMI Calculator, http://www.nhlbisupport.com/bmi/ (last visited Sept. 20, 2012).

[4] "Residual functional capacity" denotes what an individual can still do, despite his or her limitations. 20 C.F.R. § 404.1545(a).

[5] The limitations set forth by Dr. Biscardi are recorded on forms in the administrative record at R 1669-1685.

function, and functional limitations. [R 1652-67]. Dr. Odeluga reported that the claimant had no limitation in range of motion of any joint, including her knee. [R 1656]. He also performed a pulmonary function test, the results of which indicated a "before bronchodilator" $FEV_1$ of 1.34 and an "after bronchodilator" $FEV_1$ of 0.11.[6] [R 1657]. The claimant's lungs were normal on examination, with no wheezing, ronchi, or rales, although prior CT scans demonstrated that she had ground glass opacities in her lung base. [R 1654; R 1065]. In Dr. Odeluga's opinion, the claimant could frequently lift and carry up to twenty pounds, and occasionally lift and carry up to fifty pounds. [R 1661].[7] She could sit for eight hours, stand for four hours, and walk for six hours at a time without interruption, and she could sit and stand for a total of about three hours each and walk for a total of about two hours in an eight-hour workday. [R 1662]. She could only occasionally stoop, kneel, crouch, crawl, and climb stairs, ramps, ladders, and scaffolds, – limitations that Dr. Odeluga attributed to the claimant's knee pain – but could continuously balance. [R 1664]. The claimant could never work in an environment that had dust, odors, fumes, or pulmonary irritants, and she could only occasionally work in environments involving humidity, wetness, or extremes of temperature. [R 1665].

**B.    Testimony of the Vocational Expert**

At the hearing, the ALJ questioned a vocational expert to determine whether the claimant's limitations would preclude her from participating in any substantial gainful activity. The ALJ began by asking whether the VE was familiar with the claimant's work record. He was. The ALJ then asked a first hypothetical to the VE. The ALJ simply read aloud Dr. Odeluga's consultative

---

[6] "$FEV_1$" is a claimant's one-second forced respiratory volume.

[7] As the ALJ commented at the hearing, Dr. Odeluga appears to have gotten the numbers for lifting reversed. [R 1731].

examination report – the one that focused on the claimant's physical limitations – and oriented the VE to the claimant's past work, eighth-grade education and difficulty reading and writing. [R 1731-1733]. The VE responded that such a hypothetical individual could perform the claimant's past work as a child monitor, as well as other jobs, such as marker (with about 4,200 positions existing in the state of Indiana), routing clerk (1,850 positions), and mail clerk (1,050 positions). [R 1733-35]. The ALJ then proceeded to a second hypothetical, in which he instructed the VE to consider all of the same limitations, but to add the mental limitations found by Dr. Biscardi, which the VE had listened to during the hearing. [R 1734]. The VE responded that adding those limitations would have no effect on the job numbers he provided in response to the first hypothetical. The ALJ then asked a third hypothetical in which he continued to reference Dr. Biscardi's mental RFC findings, but added more stringent limitations on the claimant's physical abilities than those found by Dr. Odeluga, referencing instead the claimant's testimony at the hearing (*e.g.*, limiting the claimant to carrying one gallon of milk, as opposed to twenty pounds). [R 1736-1737]. The ALJ did not include the arm-lift limitations imposed by the claimant's sweat gland removal, but did include the asthma-related limitations from Dr. Odeluga's report. The VE responded that the claimant's past relevant work would be out, but that she could still perform the work of ticket checker (1,400 jobs in Indiana), microfilm document preparer (1,400 in Indiana), and cutter and paster of press clippings (800 in Indiana). [R 1738]. Finally, the ALJ asked a last hypothetical, which was identical to the previous one but with the addition of the arm-lift limitations imposed by the claimant's sweat gland removal. [R 1738]. The VE responded that the additional limitation would not impact the sedentary jobs he had identified. [R 1739]. If the claimant had to miss more than one day per month due to abscesses, however, the VE opined that the jobs he had identified would be unavailable. [R 1739-1740].

## C.     The ALJ'S Decision

The ALJ found that the claimant met the disability insured status requirements of the Act through December 31, 2014. [R 453]. The ALJ found that the claimant had not engaged in substantial gainful activity since the onset date of her alleged disability, and that she had severe impairments, but that her impairments did not, singly or in combination, meet or medically equal any of those included in the Listing of Impairments at 20 C.F.R. pt. 404, subpt. P, app. 1. [R 454-57]. The ALJ found that the claimant's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not credible. [R 459]. The ALJ found that the claimant had the residual functional capacity (RFC) to lift/carry a maximum of fifty pounds and frequently up to twenty pounds, consistent with Dr. Odeluga's report but inconsistent with the claimant's testimony that she could only lift a milk gallon (~8 lbs.) and not a sack of potatoes (~10 lbs.). [R 457]. The ALJ found that the claimant could sit a total of eight hours in an eight-hour workday, stand a total of four hours in an eight-hour workday, and walk a total of six hours in an eight-hour workday; she could only sit/stand for three hours at one time and walk for two hours at one time. [R 457-58]. She could only occasionally climb stairs, ramps, ladders and scaffolds, stoop, kneel, crouch, and crawl. [R 458]. On account of her asthma, she was limited to only occasional exposure to humidity, wetness, extreme cold and extreme heat, and she could not be exposed to dusts, odors, fumes and pulmonary irritants. [R 458]. The claimant was moderately limited in her ability to understand, remember and carry out complex instructions and to make judgments on complex work-related decisions. [R 458]. She was moderately limited in her ability to interact appropriately with the public and supervisors, but only mildly limited in her ability to interact appropriately with her coworkers, and she was moderately limited in her ability to respond to usual work situations and to changes in

routine work setting. [R 458]. The ALJ found that, given this RFC, the claimant could perform her past work as a child monitor; in the alternative, she could also perform other jobs that existed in significant numbers in the national economy and was therefore not disabled. [R 463-65]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and (v).

## STANDARD OF REVIEW

The commissioner's final decision in this case is subject to review pursuant to 42 U.S.C. § 405(g), as amended, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399-400. As a result, the court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law, unlike conclusions of fact, are not entitled to deference. If the commissioner commits an error of law, remand is warranted without regard to the

8

volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISCUSSION

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The five step process asks:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform relevant past work; and
5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing substantial gainful activity (step one) the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant does not have a severe medically determinable impairment or a combination of impairments that is severe and meets the duration requirement (step two), then the claimant will likewise be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not performing substantial gainful activity ("SGA") and does have a medically severe impairment, however, the

process proceeds to step three. At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, if a listing is not met or equaled, then in between steps three and four the ALJ must assess the claimant's "residual functioning capacity" ("RFC"), which, in turn, is used to determine whether the claimant can perform her past work (step four) and whether the claimant can perform other work in society (step five). 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In this case, the claimant argues that the ALJ erred at several points in the process:[8]

(1) The claimant argues that the ALJ improperly ignored evidence of the claimant's knee pain, both on its own and in conjunction with her other health problems, when assessing the severity of her impairments in steps two and three, and when calculating her RFC.

(2) The claimant argues that the ALJ erroneously performed only a "perfunctory analysis," at step three, of whether or not the claimant's asthma met a listing. The claimant also argues that the ALJ's finding that the claimant's asthma does not meet a listed impairment was not supported by substantial evidence.

(3) It is undisputed that the ALJ concluded, at steps two and three, that the claimant suffers from various limitations in her social functioning and in her ability to maintain concentration, persistence and pace that do not rise to listing level but nonetheless impact her ability to work. [*See* DE 1-1 at 9-10]. The claimant argues that the ALJ then failed to incorporate, or transfer, those findings of mental limitations into the RFC calculated between steps three and four. Because the ALJ then used the allegedly flawed RFC to question the vocational expert at the hearing, as is required by cases like *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010), the claimant argues the results of steps four and five are flawed.

---

[8] The claimant raised these issues in a different order, but the court re-orders them here according to which part of the five-step process is challenged. Where, as here, a basis for remand is discovered in one of the earlier steps, resolution of issues pertaining to the later steps is often unnecessary. The commissioner will be taking another look at the case regardless.

(4) The claimant argues that the ALJ's conclusions, with respect to steps four and five of the process, conflicted with the VE testimony on which those conclusions purported to rely, without adequately explaining or resolving the conflict.

The court finds no problem with the ALJ's treatment of the knee pain issue, but finds that the ALJ failed to confront significant contrary evidence with respect to the asthma listing analysis. As a result, the second issue warrants remand, and the court declines to resolve the third and fourth issues at this time.

**A.     Issue One: Knee Pain at Steps Two and Three**

The claimant argues that the ALJ improperly ignored evidence of the claimant's knee pain, both on its own and in conjunction with her other health problems, when assessing the severity of her impairments. Although assessing the severity of a medical impairment is a function of steps two and three, the ALJ included his analysis of the knee pain issue in the RFC section of his order:

> The claimant testified she experiences knee pain and swelling in her legs when she is on her feet too long, which she defined as over an hour at a time. When this occurs, she indicated she needs to sit down for at least two hours and elevate her leg to chair height. The claimant indicated her doctor told her she would eventually require knee replacement, but there is no doctor statement relating to such in the record. The claimant's representative argued in her brief to the Appeals Council that the undersigned did not adequately evaluate the claimant's need to elevate her leg in the last decision. That was based upon a medical note documenting paresthesias in the right lower extremity and an episode of falling. It should be noted that this doctor's note was in 2005 and centered around her cesarean section pregnancy and shortly after pregnancy. Further and most importantly, the doctor documented the claimant's right lower extremity as being unremarkable, which suggests his impression of paresthesias in the right lower extremity was connected to her previous complaints after her C-section (Exhibits 2F; 8F). The weakness in the iliopsoas quads and hamstrings in the right lower extremity were noted as being only mild (Exhibit 2F/5, 8F/37, 39). A right knee x-ray in 2005 was normal (Exhibit 8F/101). Although the most recent right knee x-ray showed small joint effusion, which does not warrant a more restrictive residual functional capacity, no diagnosis of arthritis was ever given. Instead, only knee pain was documented and no swelling, stiffness nor effusion was noted during the medical consultative examinations (Exhibits 5F; 21F). The claimant also had a full range of motion in each of her lower extremity joints and her muscle strength was normal, which suggests that the claimant's

> weakness was circumstantial and, certainly, did not carry over into the present (Exhibits 5F; 13F/166, 170; 14F; 16F; 21F/4, 16). As such, a requirement that the claimant be allowed to elevate her leg during the workday is not justified[,] not only because [of] the lack of objective findings, but also due to the overall lack of truthfulness of the claimant as discussed throughout this decision. The claimant also suffers from obesity with a BMI of 40.7, which likely exacerbates her alleged knee pain (Exhibit 21F/2). When the claimant's knee impairment is taken into account with her obesity, the undersigned finds it warranted to restrict the claimant to continuous use of foot controls and balancing and occasional posturals.

[DE 1-1 at 12-13]. The claimant argues that the preceding analysis shows that the ALJ "ignore[d] an entire line of evidence that is contrary to [his] ruling[,]" and that ALJ failed to "confront the evidence that does not support his conclusion and explain why it was rejected." [DE 21 at 14, quoting *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)]. To support those arguments, the claimant explains that the record indicated that the claimant consistently reported pain in her right knee; that the claimant stated her knee "popped" frequently and was unable to support her weight; and that her physician told her her knee was "hanging by a thread." [DE 21 at 14]. The claimant also argues the ALJ failed to consider the effect of her obesity on her knee pain and limitations. [DE 21 at 16].

First, the court notes that the ALJ clearly did not "ignore" these issues, as the claimant at one point alleges. They are each specifically noted and addressed in the excerpt above. The analysis may have belonged at steps two and three, and have therefore been "misplaced," but it was there nonetheless. Nor did the ALJ fail to "confront the evidence" and explain why it was rejected, as the claimant correctly notes is required by case law. *See Golembiewski*, 322 F.3d at 917; *Kasarsky v. Barnhart*, 335 F.3d 539, 542 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The ALJ explained that a finding that the claimant's knee is impacted by the pain she reports to the extent that it requires elevation throughout the workday is prohibited by (1) a lack of objective

12

findings to support that conclusion – a statement which is well-supported in the record at the locations cited by the ALJ – and (2) a lack of credibility on the part of the claimant.

The fact that the ALJ paired these two findings together distinguishes this case from *Villano v. Astrue*, 556 F.3d 558 (7th Cir. 2009), in which the Seventh Circuit held that "the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Id*. at 562 (citing S.S.R. 96-7p; 20 C.F.R. § 404.1529(c)(2); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000)). The ALJ did not discredit the testimony "solely" because of a lack of objective support; he also found the claimant's testimony independently incredible due to her frequent, self-serving inconsistent statements. While SSR 96-7p does require an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding, *see Golembiewski*, 322 F.3d at 915-17, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). In this case, the inconsistencies that caused the ALJ to find the claimant incredible were real, were highlighted throughout the ALJ's decision and were explicitly presented as a basis for a credibility finding. [*See*, e.g., DE 1-1 at 12, 14-15]. Furthermore, they were substantiated by other record evidence in addition to that cited by the ALJ. For example, one of the psychological examiners who assessed the claimant's condition in November, 2010, noted that the claimant was "faking [a] bad response style or an exaggeration of symptoms" in order to achieve her desired result. [R 1646].

In short, while it is the duty of the court to ensure that the ALJ's findings are supported by substantial evidence and that the ALJ drew a "logical bridge" between the evidence presented and

his conclusions, *see Terry*, 580 F.3d at 475, is it emphatically *not* the duty of the court "to decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner[.]" *Butera*, 173 F.3d at 1055. What the claimant is asking for here is much more like the latter than the former. The argument, stripped to its essence, is that the ALJ should have believed the claimant about the extent of her knee pain, even where her claims were not supported by the objective medical evidence, but did not. That is the sort of re-weighing of the evidence in which this court will not engage on appeal. The ALJ provided substantial evidence and a logical bridge for his factual conclusions with respect to knee pain, and a reasonable basis for his credibility determinations. That is enough.

Finally, the court notes that the ALJ did adequately address the impact of the plaintiff's obesity on her knee pain. It is true, as the claimant alleges, that an ALJ must consider the bearing of a claimant's obesity on her knee pain: "[A]n applicant's disabilities must be considered in the aggregate." *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011); *see also Barrett v. Barnhart*, 355 F.3d 1065, 1068-69 (7th Cir. 2004). As Judge Posner pointed out in *Martinez*, "[i]t is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40." *Id*. at 698. The claimant in this case, like the claimant in *Martinez*, has a BMI in excess of 40, which indicates "extreme obesity." But in *Martinez*, the ALJ failed to consider the claimant's obesity in conjunction with her knee pain at all. Here, the ALJ indicated that he *did* consider it, and it had an impact on his analysis to the extent that he limited the claimant's ability to perform certain tasks, consistent with Dr. Odeluga's determination regarding the effect of the knee pain:

> The claimant also suffers from obesity with a BMI of 40.7, which likely exacerbates her alleged knee pain (Exhibit 21F/2). When the claimant's knee impairment is taken into account with her obesity, the undersigned finds it warranted to restrict the claimant to continuous use of foot controls and balancing and occasional posturals.

14

[DE 1-1 at 13]. Nonetheless, the claimant argues that this analysis is too perfunctory. The court disagrees. While further elaboration may have been helpful, the court cannot say that the ALJ's conclusion did not properly account for the plaintiff's obesity in this case. Her testimony as to her knee pain was not the only source of evidence on the effect that obesity had on her ability to stand, walk, etc. To the contrary, *all* of the evidence on which the ALJ properly relied – physicians' reports which found little to no knee mobility limitations, which reported pain or mild joint effusion but did not prescribe any surgical intervention or elevation requirements, and which provided a basis for concluding that any problems with paresthesias were temporary and occurred in conjunction with the claimant's C-section – was collected *while* the claimant was morbidly obese. In other words, the claimant's obesity has existed since before the claimed disability onset date. When physicians evaluated her complaints of knee pain, they evaluated her knee pain in the context of her being an obese woman. By relying on those physicians' reports in assessing the extent of the claimant's knee pain, the ALJ too was – by extension – assessing the extent of her knee pain in the context of being an obese woman. Given that, to find that the ALJ failed to account for the interrelationship between the claimant's knee pain and her obesity would be to disregard the reality of the record. The claimant's arguments with respect to the ALJ's treatment of her knee pain do not persuade the court that reversal or remand is required.

**B.     Issue Two: Step Three and the Asthma Listing Analysis**

The claimant next takes issue with the ALJ's analysis of whether the claimant's asthma meets a listing. She argues that the ALJ erroneously performed only a "perfunctory analysis;" that the ALJ's finding that the claimant's asthma does not meet a listed impairment was not supported by substantial evidence; and that the ALJ failed to consider objective evidence demonstrating the

15

severity of her asthma. In step two of his analysis, the ALJ concluded, without discussion, that the claimant does have asthma rising to the level of a "severe impairment." [DE 1-1 at 7]. At step three, the ALJ's consideration of whether the claimant's asthma rose to listing level severity was similarly concise:

> Despite the claimant's diagnosed impairments, the medical evidence does not document listing level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, either individually or in combination. The medical expert testified that the claimant did not meet or medically equal a listing. Finding no evidence suggesting a different conclusion is more appropriate, the undersigned adopts the medical expert's finding in this regard. In making this finding, the undersigned considered listings 3.03 (Asthma); 12.02 (Organic Mental Disorders); 12.04 (Affective Mental Disorders) and Social Security Ruling 02-1p (Obesity).

[DE 1-1 at 8]. The ALJ did perform a more thorough assessment of the claimant's asthma during his RFC analysis [DE 1-1 at 12], but the effect her asthma has on her ability to work is a different question than whether her asthma meets a listing. If her asthma satisfies a listing, she is generally entitled to a finding of disability without reference to her ability to work. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

This is a step three issue. Step three accounts for the possibility of a "presumptive disability." "Under a theory of presumptive disability, a claimant is eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1). The claimant has the burden of showing that her impairments meet a listing, and she must show that her impairments satisfy all of the various criteria specified in the listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)). At the same time, "[i]n considering whether a claimant's condition meets or equals a listed impairment, an

ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668 (citing *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2002); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2003)). As usual, the court asks whether the ALJ's decision is supported by substantial evidence and whether it draws a logical bridge between the evidence and its conclusions. *See Mogg v. Barnhart*, 199 Fed. Appx. 572, 575 (7th Cir. 2006). The ALJ is entitled to rely – as he did here – on the opinions of state agency physicians in determining that a claimant's impairments do not equal a listing, *see Scheck v. Barnhart*, 357 F.3d 697 (7th Cir. 2004), but he must still confront significant evidence that conflicts with his decision. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995).

The ALJ properly identified the listing at issue: 3.03. He then referenced the opinions of the medical examiners that the listing was not met or equaled, and moved on. Absent any contrary evidence, that might be sufficient, but there is significant contrary evidence here which the ALJ did not address. There are two paths to a finding of disability under 3.03. Relevant to this case, under 3.03A, for a claimant with "chronic asthmatic bronchitis," an ALJ must evaluate the claimant under the criteria for chronic obstructive pulmonary disease, located in listing 3.02A. The requirements of 3.02A (and therefore 3.03A) are met if the claimant's $FEV_1$ is equal to or less than the value depicted on a chart that correlates to the claimant's height.[9] *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, 3.02A, Table 1.

The claimant in this case took a pulmonary function test, with two forced expiratory maneuvers returning $FEV_1$ numbers of 1.34 (before bronchodilator) and 0.11 (after bronchodilator).

---

[9] "$FEV_1$" is a claimant's one-second forced respiratory volume, and for listing analysis purposes it should represent the largest of at least three satisfactory expiratory maneuvers. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 3.00E.

[R 1657]. The next question under 3.02A and 3.03A is whether that figure – 1.34, the higher one – is low enough to support a finding of presumptive disability. That depends on the claimant's height, which should ordinarily be a straightforward thing to measure. As mentioned, however, the record is all over the yardstick with respect to this claimant's height, with reports ranging from 5'2" to 5'8". [R 404, 949, 1105, 1158, 1198, 1619, 1702]. Nonetheless, the ALJ chose to resolve the issue earlier in his order, finding that the claimant was 5'6". [DE 1-1 at 9]. If the claimant is 5'6" (66 inches), her $FEV_1$ of 1.34 corresponds to a finding of disability on the listing table. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, 3.02A, Table 1. Despite that stark reality, the ALJ did not even address the test results, or compare the results and the claimant's height to the table. To the contrary, he noted that he found "no evidence suggesting a different conclusion is more appropriate" than the one he reached, indicating that he did not consider the $FEV_1$ figures at all. Plainly, this evidence *does* suggest a different conclusion.

In the end, there may be good reasons for finding the results of the claimant's pulmonary function test incredible, especially as compared to the medical experts' opinions. For example, it is very unlikely that the claimants height is actually fluctuating so significantly as the record makes it seem. It would not be a difficult question to resolve, and perhaps 5'6" is the wrong number. If the claimant in fact measures between 5'2" and 5'5", her $FEV_1$ would not meet listing 3.03. For that matter, the figures produced by the test themselves raise eyebrows. A bronchodilator is, by definition, a drug that *increases* the volume of the lungs. It is therefore exceedingly strange that the claimant's exhale volume *decreased* by 92 percent after a bronchodilator was applied. The implication may be that her second exhale was something less than an honest effort. A finding like this could suffice to explain why the ALJ disregarded what at first glance appears to be conclusive

evidence that the claimant's asthmatic condition meets a listing. But what matters at this juncture is that the ALJ did not make any such finding. This court requires an ALJ to explain why he rejected a piece of evidence; otherwise, this court cannot determine whether the ALJ properly rejected the evidence, or even considered it all. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2001). The ALJ's failure to confront significant contrary evidence warrants remand. *Golambiewski*, 322 F.3d at 917.

**C.     Remaining Issues**

The remaining two issues raised by the claimant pertain to the ALJ's RFC determination, to the results of steps four and five of the process, and particularly to the information provided by the VE at the hearing. These issues come after the step three listings analysis in the determinative process, and the outcome of step three controls the outcome of the case, at least to the extent that a finding that a listing is met warrants a finding of disability. The court has already found that remand is required so that the ALJ can confront significant contrary evidence at step three. It is not clear how that issue will be resolved, and it is therefore not clear whether the matter will need to proceed to the RFC phase, or to steps four and five, at all. As a result, the court need not formally resolve the remaining issues in this order.

A few basic observations are appropriate, however, before concluding the order. First, the claimant is not correct that the VE testified that the claimant's arm limitations would preclude her from performing significant numbers of the positions he identified [R 1739], but she is correct that the VE testified that the work absences allegedly caused by her abscesses would preclude her from holding down any such job. [R 1739-40]. It is not clear, though, that the ALJ "ignored" this favorable evidence, as the claimant suggests. In his order, the ALJ specifically confronted that claim and explained why he did not find any "work-absence" limitations imposed by the abscesses going

19

forward, relying in particular on medical expert reports which found no such abscesses after the sweat gland removal was completed. [DE 1-1 at 7]. Second, the claimant's remaining argument is that the ALJ failed to properly incorporate limitations in her ability to maintain concentration, persistence and pace in his RFC finding, but the last three sentences of the ALJ's RFC finding [DE 1-1 at 11] are nearly word-for-word identical to the way in which Dr. Biscardi translated her limitations in concentration, persistence and pace into an RFC description at the hearing. [R 1727-28]. In short, no RFC errors, or step four or five errors, jump out at the court without further analysis, and further analysis is unnecessary given the outcome of the preceding issue. Nonetheless, as the case is being remanded regardless, the commissioner is encouraged to clarify any ambiguities with respect to these issues in an effort to help reduce the distance between the parties' positions and to satisfy the claimant that the process has been as thorough as the law requires.

## CONCLUSION

While the court will not re-weigh the evidence or second-guess the ALJ's credibility determinations in a social security case, *see Butera*, 173 F.3d at 1055, the ALJ does need to confront significant evidence that runs contrary to his decision. In this case, significant – dispositive, actually, if believed – evidence exists in the record that the claimant's asthma meets a listing and therefore would warrant a finding of presumptive disability. The ALJ failed to address this evidence in reaching the opposite conclusion. Accordingly, the court **REMANDS** the case for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED:   September 26, 2012

/s/ JON E. DEGUILIO
Judge
United States District Court

20